## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SKYLER HEAVANS,

        Plaintiff,

    v.

GENE DODARO,
Comptroller General of the United States
Government Accountability Office,

        Defendant.

Civil Action No. 22-836 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Plaintiff Skyler Heavans, a naturalized U.S. citizen from Iran, and resident of the District of Columbia, Complaint ("Compl.") ¶ 4, 9, ECF. No 1, brings this action against his employer, the head of the U.S. Government Accountability Office ("GAO") in his official capacity, alleging discrimination on the basis of national origin and sex, retaliation, and hostile work environment during plaintiff's employment at GAO's Learning Center ("LC"), under Title VII of the Civil Rights Act of 1664 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, Compl. ¶¶ 11, 13, 15, 17. Defendant has moved for dismissal, in whole or part, ("Def.'s Mot."), ECF No. 13, of all four claims, on the grounds that plaintiff failed to exhaust his administrative remedies as to much of the conduct complained of, that other conduct complained of is *de minimis* and therefore non-actionable, and that plaintiff fails to state plausible claims to relief on his sex discrimination and hostile work environment claims.  For the reasons explained below, defendant's motion is granted in part and denied in part, and this suit will proceed based only on plaintiff's national origin discrimination and retaliation claims.

1

# I.      FACTUAL AND PROCEDURAL BACKGROUND

Summarized below is relevant factual background, as set out in the Complaint, followed by the procedural history leading to the pending motion.

## A.  Alleged Discriminatory Conduct

Plaintiff began working at GAO in August 2013, and served, during the years relevant to this suit, as the Assistant Director of Instructional Systems Design and Learning Technologies, which position was part of LC's leadership team.  Compl. ¶¶ 6–7.  According to the complaint, before April 2019, plaintiff "had only positive performance reviews," *id.* at 6, until April 1, 2019, when Kirstin Austin, a white American woman, was hired as LC's new Chief Learning Officer ("CLO") and became plaintiff's supervisor.  *Id.* ¶¶ 6, 8.  At the time of Austin's hiring, "[p]laintiff was the only Iranian-American Director among the all-white, non-Iranian American LC Leadership Team," and "[a]fter October 2019, [p]laintiff was only one of two men" on the team.  *Id.* ¶¶ 7, 12.

### 1.  *April 2019 to July 2021: Alleged Discriminatory Treatment Under New Supervisor*

Plaintiff alleges that the discriminatory treatment based on his national origin began almost immediately upon Austin's start.  On Austin's second day on the job, she conducted individual meetings with each of LC's employees.  *Id.* ¶¶ 8–9.  During his meeting, plaintiff alleges that Ausin asked him "where [he was] from []" and "stated that the [p]laintiff's name was 'not Middle-Eastern.'"  *Id.* ¶ 9.  Following that meeting and continuing throughout his time working under Austin's supervision, plaintiff alleges that "Ms. Austin treated him differently and scrutinized him more severely than the non-Iranian directors."  *Id.* ¶ 10.  Much of this differential treatment seems based on plaintiff's Iranian background.  In particular, he claims that on multiple separate occasions on unspecified dates, she would skip over him in meetings and say

she "did not understand him" in front of his peers. During a one-on-one feedback session on June 22, 2021, Austin "mimicked and caricatured the Plaintiff's Iranian accent, mocking his national origin with a deeper male voice," and, between June and August of 2021, Austin "corrected" plaintiff's pronunciation of her name "in several successive team meetings," despite "[p]laintiff explain[ing] multiple times that her name was difficult to pronounce due to his accent," even while others also mispronounced her name without being corrected.  *Id.* ¶¶ 11, 42–45

Regarding sex discrimination, plaintiff alleges that from April 2019 to April 2020, Austin "repeatedly complained about a 'man' who made her life difficult at her former job at the Department of Homeland Security," that she directed these comments pointedly at him, and that he found them "discriminatory and harassing based upon his sex."  *Id.* ¶¶ 14–16.

At an unspecified time, plaintiff confronted Austin directly about some of these actions, telling her that they "lack[ed] people values" (employing "a phrase used when training GAO employees in diversity initiatives").  *Id.* ¶¶ 28, 38.  She did not take this kindly, as plaintiff alleges that "[i]mmediately after this, Ms. Austin further isolated the Plaintiff, turning more staff and stakeholders against him and creating a hostile work environment in retaliation for his criticism of Ms. Austin's conduct."  *Id.* ¶ 39.

Concurrently with this behavior, Austin also made decisions that negatively affected plaintiff's work.  On September 17, 2019, Austin announced the discontinuation of three "initiatives" plaintiff had been developing within the LC for the prior two and a half years, although they had "achieved great success within the LC and had high visibility throughout GAO," when, by contrast, none of plaintiff's team members had their initiatives discontinued. *Id.* ¶¶ 17–19.  In December 2019, Austin gave her first performance review to plaintiff, which review "contained his first negative statement rating in his entire 18-year career in federal

service." *Id.* ¶ 20. Around the same time, Austin began sidelining him: "[f]rom October 2019 to March 2020, Ms. Austin increasingly passed over the Plaintiff during meetings and excluded him from decisions that directly affected his work," "removed him from management emails and from discussions about LC operations and activities," "excluded him from final interviews for the hiring of his own direct report," and did not give plaintiff the same "professional development opportunities accorded his fellow directors." *Id.* ¶¶ 22–24, 27, 33. At his second annual performance review with Austin in December 2020, plaintiff, once again, received a lower rating than he believed he deserved. *Id.* at ¶¶ 29–30.

From the time of Austin's hiring through the end of 2020, plaintiff repeatedly informed another supervisor about Austin's behavior towards him, but that supervisor discouraged him from initiating internal mediation proceedings or filing a complaint, and seemingly did not report plaintiff's concerns to others. *Id.* ¶¶ 25–26, 31–32.

Plaintiff continued to struggle with Austin's decisions and treatment of him in 2021. On May 13, 2021, Austin held a meeting with the managers of other GAO departments, and "unbeknownst to the Plaintiff," "inaccurately" criticized one of his projects "to make him appear incompetent." *Id.* ¶ 35. Days later, on plaintiff's "pre-scheduled day off," Austin and another supervisor "contacted [plaintiff] three times within a 24-hour period to ask why he was unable to attend" an LC management training scheduled for that day, and then "criticized" him "for not providing an immediate response," even though they "kn[e]w why the Plaintiff was unable to attend." *Id.* ¶¶ 36–37. On May 24, 2021, Austin fired one of plaintiff's subordinate program managers "without the Plaintiff's knowledge," which "adversely impacted the Plaintiff's relationships with the rest of his team, who believed that the termination . . . was his decision." *Id.* ¶¶ 40–41.

From June 24 to July 8, 2021, plaintiff was out of the office on a pre-scheduled vacation. *Id.* ¶ 46.  Austin and another of plaintiff's supervisors allegedly took the opportunity to "me[et] with each of Plaintiff's direct reports to inquire about his performance as a manager" while he was away.  *Id.*

### 2. July 2021 to December 2021: Alleged Retaliation and Continued Discriminatory Conduct

Upon plaintiff's return to the office on July 8, 2021, tensions quickly came to a head.  He noticed that Austin had scheduled a meeting for the following day for herself, plaintiff, and another of plaintiff's supervisors.  *Id.* ¶ 47.  At this point, plaintiff began to seek formal administrative help: he contacted GAO's Office of Opportunity and Inclusion (O&I) and another of his supervisors to "request[] a mediator to attend the July 9, 2021[] meeting, citing "Ms. Austin's continued discriminatory treatment" and her "humiliating behavior of mocking his Iranian accent."  *Id.* ¶ 48.  He repeated this request for mediation on the day of the meeting; Austin, however, allegedly "refused to engage in mediation to resolve Plaintiff's concerns."  *Id.* ¶¶ 49–50.

At the July 9, 2021 meeting, plaintiff's situation further deteriorated.  First, Austin notified him that he had received "'Marginal' performance ratings for each of his performance competencies," *id.* ¶ 51, which came as a shock to plaintiff because only three months before, he had been assured by another supervisor that he was on track to receive positive ratings in a mid-point performance review, *id.* ¶¶ 34, 52.  Austin then informed him that "he would no longer receive the benefit of a 'flex schedule' and would be moved to a standard Monday to Friday work week."  *Id.* ¶ 53.  In response, plaintiff told her that "mocking his voice on June 22, 2021 was unacceptable, as were the false accusations presented to him during the meeting," and that "he intended to file an internal complaint against her for discrimination, retaliation, and hostile

work environment." *Id.* ¶¶ 54–55.  Following that meeting, plaintiff alleges that he "was required to use sick leave for severe and worsening depression attributable to Ms. Austin's discriminatory, retaliatory and harassing conduct." *Id.* ¶ 56.

Meanwhile, plaintiff pursued his administrative complaints.  On July 12, 2021, he sent an email to "Human Capital personnel . . . informing them that he was subjected to a hostile work environment and retaliation." *Id.* ¶ 58.  One individual responded, referring plaintiff to O&I. *Id.* ¶ 59.  On July 14, 2021, he contacted O&I to initiate EEO counseling. *Id.* ¶ 60.  He had his first meeting with O&I on July 23, 2021, and on August 10, 2021, he received his "Notice of Right to File a Formal Discrimination Complaint. *Id.* ¶¶ 61–62.

Plaintiff alleges that immediately thereafter, Austin escalated her problematic conduct. Three days after plaintiff received his O&I Notice, she "announced that the Plaintiff would be excluded from all future LC management meetings," which he had regularly attended since 2016, and from which he would be the only director excluded. *Id.* ¶ 63.  Within an hour of that announcement, she also transferred an employee who had been directly reporting to plaintiff such that she would report to Austin instead, which effectively removed plaintiff's management responsibilities on one of the projects he had led for four years. *Id.* ¶ 64.  The same day, she announced the reinstatement of one of plaintiff's initiatives that she had discontinued in 2019, assigning it to "a female subordinate" instead of plaintiff. *Id.* ¶¶ 19, 65, 73.  Furthermore, between August 18 and 20, 2021, "after Plaintiff filed his complaint of discrimination and retaliation," he began to receive "only 'Marginal' performance ratings in his performance feedback," and was given a "written reprimand" for his pronunciation of Austin's name "with his Iranian accent." *Id.* ¶¶ 45, 66.

In light of this worsening treatment, plaintiff "amended his claims with O&I to include additional claims of discrimination, retaliation and harassment/hostile work environment." *Id.* ¶ 68. His formal complaint, as amended, was filed August 22, 2021. *Id.* ¶ 3.

As GAO's investigation in plaintiff's claims was ongoing, "[p]laintiff was . . . moved from his managerial position to a non-managerial position in another department ("ISTS") without his consent." *Id.* ¶ 71. Around the same time, a non-Iranian female employee received a promotion within LC, although plaintiff alleges she had received lower performance ratings than he had. *Id.* ¶ 72. In December 2021, Austin conducted yet another annual performance review for plaintiff, "despite his pending discrimination and retaliation complaints against her," and once again gave him poor ratings. *Id.* ¶ 74.

### B. Procedural Background

As noted *supra*, plaintiff filed a formal administrative complaint of employment discrimination with GAO's O&I on August 22, 2021. *Id.* ¶ 3. GAO did not issue a final decision within 180 days, after which plaintiff brought the instant suit in federal court. *Id.* His four federal claims allege discrimination based on national origin and sex, retaliation for engaging in protected activity, and hostile work environment, all in violation of Title VII. *Id.* ¶¶ 77–142. Defendant now seeks partial dismissal of plaintiff's claims, targeting for dismissal his sex discrimination and hostile work environment claims, as well as any portions of his remaining two claims for national origin discrimination and retaliation predicated on unexhausted or non-actionable allegations, which motion became ripe on November 21, 2022. *See* Def.'s Reply Mem. in Supp. Mot. to Dismiss ("Def.'s Reply"), ECF 18.

## II.    STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "[a] plaintiff need not make 'detailed factual allegations,'" but the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *VoteVets Action Fund v. United States Dep't of Veterans Affairs*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  Consequently, "a complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by the plaintiff, both of which are plausible.'"  *VoteVets Action Fund*, 992 F.3d at 1104 (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015)) (alteration in the original).

In deciding a motion under Rule 12(b)(6), the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact."  *Twombly*, 550 U.S. at 555; *see also Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022).  Courts do not, however, "assume the truth of legal conclusions, nor do [they] 'accept inferences that are unsupported by the facts set out in the complaint.'"  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (alteration in original) (citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

III.     **DISCUSSION**

Defendant argues, first, that plaintiff failed to exhaust his administrative remedies as to much of the allegedly discriminatory and retaliatory conduct narrated in his complaint, which stretches back to 2019, because plaintiff only began pursuing his administrative remedies in 2021.  It moves for partial dismissal of Counts I, II, and III insofar as these claims for discrimination and retaliation rest on those unexhausted allegations.  *See* Def.'s Mem. Supp. Mot. Dismiss ("Def.'s Mem.") at 11–14, ECF 13.  Next, turning to the timely allegations, it contends that plaintiff fails to plausibly allege a sex discrimination (Count II) or hostile work environment claim (Count IV), and that his remaining claims for national origin discrimination and retaliation (Counts I and III) must be dismissed in part insofar as they rely on non-actional, *de minimis* conduct.  *Id.* at 14–22.  These arguments are addressed in turn.

### A.  Exhaustion of Administrative Remedies for Counts I, II, and III

Defendant argues that many of the factual allegations underlying plaintiff's discrimination and retaliation claims (Counts I, II, and III), even if amounting to actionable conduct, are not cognizable because plaintiff did not initiate administrative proceedings regarding that conduct until long after his deadline to do so under applicable regulations.[1]  *See* Def.'s Mem. at 12–13.  As a result, plaintiff failed properly to exhaust his administrative remedies as to those allegations, which consequently cannot serve as the basis for his claims in federal court.  *Id.*  Plaintiff counters that dismissal on this basis is improper, first, because the untimely allegations can still underlie his claims as background information, and second, because they are inextricably linked to later-in-time allegations that were timely exhausted.

---

[1]       As discussed *infra*, defendant's exhaustion arguments do not pertain to plaintiff's hostile work environment claim in Count IV.

### 1. *Exhaustion Requirement Generally*

"GAO is a legislative branch agency for which the United States Congress has created a personnel system separate from the system of the executive branch." *Chennareddy v. Bowsher*, 935 F.2d 315, 319 (D.C. Cir. 1991) (citing 31 U.S.C. § 731 *et seq.*).  "GAO employees, however, have the same rights and remedies under laws prohibiting discrimination in employment in the federal government as do employees of the executive branch."  *Id.* (citing 31 U.S.C. § 732(f)(2)). Therefore, pursuant to Title VII of the Civil Rights Act of 1964, GAO may not "fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(b); *see also* 31 U.S.C. § 732(f)(2) ("This subchapter and subchapter IV of this chapter do not affect a right or remedy of an officer, employee, or applicant for employment under a law prohibiting discrimination in employment in the Government on the basis of race, color, religion, age, sex, national origin, political affiliation, marital status, or handicapping condition."). "Before filing suit, a federal employee who believes that her agency has discriminated against her in violation of Title VII must first seek administrative adjudication of her claim."  *Payne v. Salazar*, 619 F.3d 56, 58 (D.C. Cir. 2010) (citation omitted).  "Congress directed that the [Personnel Appeals Board] have the same authority over equal employment opportunity and discrimination matters at GAO as its counterpart agencies, *e.g.*, the [Equal Employment Opportunity Commission (']EEOC['')], the Merit Systems Protection Board ('MSPB'), and the Federal Labor Relations Authority ('FLRA'), have over such matters in the executive branch."  *Chennareddy*, 935 F.2d at 319 (citing 31 U.S.C. § 732(f)(2)(A)) (additional citations omitted).

As with those executive branch agencies, GOA has issued detailed procedures and deadlines an employee must follow to administrative exhaust his claims before that employee can file suit against the agency for violation Title VII.  *See id.; cf. Payne*, 619 F.3d at 58.  The exhaustion requirement "serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision," *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (cleaned up), and "ensure[s] that the federal courts are burdened only when reasonably necessary," *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985).  As relevant here, under GAO regulations, a "charge alleging prohibited discrimination" is subject to "GAO Order 2713.2."  4 C.F.R. § 28.98(a).  That Order, in turn, requires an aggrieved person to contact an O&I counselor within 45 days of the date of the matter alleged to be discriminatory.  GAO Order 2713.2 at ch. 3; *see also Horvath v. Dodaro*, 160 F. Supp. 3d 32, 38 (D.D.C. 2015).

Exhaustion inquiries focus on each discrete discriminatory act that is alleged by an employee.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–11 (2002).  "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed [administrative] charges."  *Id.* at 113.  Thus, a Title VII complainant "must timely exhaust administrative remedies *for each discrete act alleged*[,]' even if the acts are related." *Mount v. Johnson*, 36 F. Supp. 3d 74, 84 (D.D.C. 2014) (Jackson, K.B., J.) (quoting *Laughlin v. Holder*, 923 F. Supp. 2d 204, 209 (D.D.C. 2013)) (emphasis in original).

### 2. *Plaintiff Failed Timely To Exhaust Claims Based On Alleged Discriminatory Conduct Taking Place Prior To May 30, 2021.*

Plaintiff's basis for his four claims consists of a litany of allegations covering conduct dating back to April of 2019, when Austin became his supervisor.  Many of those allegations amount to "discrete discriminatory acts," *Morgan*, 536 U.S. 110, including, for example, Austin's allegedly pointed complaints about a "man" who had made her life difficult, Compl.

¶¶ 14–16, plaintiff's negative performance reviews in 2019 and 2020, *id*. ¶¶ 20–21, 29–31, and plaintiff's exclusion from management discussions and decisions relevant to his job and from professional development opportunities from 2019 to 2021, *id*. ¶¶ 22–24, 27, 33, 40–41.  Thus, plaintiff's claims as to those acts accrued from the dates those acts occurred, beginning in April of 2019.

Plaintiff, however, did not initiate his administrative proceedings to address the alleged misconduct until July 14, 2021, when he contacted GAO's O&I to begin counseling.  Compl. ¶ 60.  Defendant therefore argues that many of the allegations in the Complaint—all those taking place prior to May 30, 2021, which is 45 days prior to plaintiff's initiation of administrative proceedings—are time barred and therefore cannot support his claims.  Def.'s Mem. at 12–13; Def.'s Reply at 2–3.

Without disputing that he first took administrative action in July of 2021, months-to-years after many of the allegations recounted in his Complaint, *see* Pl.'s Opp'n Def.'s Mot. Dismiss ("Pl.'s Opp'n") at 4, ECF No. 15, plaintiff nonetheless contends, first, that these allegations should still be considered as "relevant background evidence" that "illustrate[s] the history of workplace conditions to which Heavans had been subjected and about which he complained in his 2021 administrative complaint;" "highlight[s] the discrimination to which Heavans was subjected to [*sic*], the protected activity in which Heavans' [*sic*] engaged, and the resulting adverse action from which he suffered immediately after he engaged in protected activity;" and are "probative of discriminatory and retaliatory intent which are relevant to those timely discrimination claims."  *Id.* at 6. As support, plaintiff relies on *Bajaj v. U.S. Department of Housing and Urban Development*, which plaintiff construes as denying the defendant's motion to dismiss raising the affirmative defense of lack of exhaustion because all the untimely

acts could still be considered as relevant background evidence.  Pl.'s Opp'n at 6–7.  In reality,
however, *Bajaj* noted that the alleged acts for which administrative remedies were not timely
exhausted "cannot provide a basis for recovery" and "conclude[d] that Bajaj is precluded from
predicating her claims . . . on any such acts."  No. 21-cv-1149 (RDM), 2022 WL 612598, at *5–6
(D.D.C. March 2, 2022).  Contrary to plaintiff's reading, the *Bajaj* Court denied the motion to
dismiss because the claims were adequately based on other discrete acts that were timely raised,
not because the untimely allegations were relevant as background evidence.  *Id.*  So too here.
The fact that plaintiff's untimely allegations may provide background information "'in support of
[his] timely claims'" does not render those acts "independently actionable," and as such does not
militate against partial dismissal of claims for relief predicated on unactionable allegations for
lack of exhaustion.  *Id.* at *5 (quoting *Morgan*, 536 U.S. at 113).

Plaintiff argues, next, that the allegedly discriminatory acts that took place prior to May
30, 2021 remain actionable in the instant suit because they are "inextricably linked to the timely
adverse actions alleged in Plaintiff's complaint."  Pl.'s Opp'n at 14.  As support for this
contention, he points to many of the time-barred actions as being "of the same type as those
taken during the 45-day statute of limitations period."  *Id.* at 10.  For example, plaintiff timely
acted on Austin's allegedly inappropriate mimicking and correction of plaintiff's Iranian accent
in June and August of 2021, and he contends that the untimely allegations having do with Austin
telling plaintiff during earlier meetings that "she did not understand him" amount to the same
type of conduct, and thus are "inextricably linked" to the timely conduct and remain actionable.
*See id.* at 10–14 (listing examples).  Unlike in the Ninth Circuit case plaintiff relies upon for this
theory, however, the acts taking place at different times as alleged by plaintiff cannot be
characterized as steps within a single process, such that the discriminatory act could be plausibly

said to have occurred only at the conclusion of that process. *Cf. Shelley v. Geren*, 666 F.3d 599, 605–06 (9th Cir. 2012) (concluding that where the allegedly discriminatory hiring decisions "were not discrete employment actions, but were part of a single, two-step process" in which the employer "sought to fill the position first on a temporary basis, followed by a permanent appointment after 120 days," a claim timely made with respect to the second step could rely on allegations concerning the first). Moreover, to the extent that plaintiff's assertions of the similarity of the various allegations should be construed as arguing for the application of the continuing violations doctrine—under which an administrative charge is construed to encompass all claims "like or reasonably related to" the allegations contained in the charge, *see, e.g.*, *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation omitted)—that doctrine was squarely rejected by the Supreme Court in *Morgan*, which held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113.

Defendant is therefore correct that plaintiff's allegations of discriminatory acts that took place prior to May 30, 2021 were not properly exhausted and thus cannot support any remedy for his Title VII national origin and sex discrimination or retaliation claims, in Counts I, II, and III, respectively. Accordingly, those portions of plaintiff's discrimination and retaliation claims are dismissed.[2]

---

[2]     The unexhausted factual allegations are in paragraphs 8 through 18 and 20 through 41 of the Complaint, leaving as exhausted allegations those in paragraphs 19 and 42 through 76 in the Complaint to support the surviving claims.

**B. Plaintiff Fails to State Claims for Sex Discrimination and Hostile Work Environment, and in his Surviving National Origin Discrimination and Retaliation Claims Certain Allegations Are Non-Actionable.**

Plaintiff's four claims are now assessed, *seriatim,* under the Rule 12(b)(6) standard, based on the surviving underlying factual allegations set out in the Complaint. Accepting those surviving allegations as true, plaintiff fails to establish his entitlement to relief on his Title VII sex discrimination and hostile work environment claims, warranting dismissal of those claims for failure to state a claim. Similarly, because some of the non-exhausted allegations underlying plaintiff's Title VII national origin discrimination and retaliation claims are non-actionable, those portions of those two claims must be dismissed. Plaintiff nonetheless successfully states a plausible claim to relief on his national origin discrimination and retaliation claims based on the remaining allegations, and the suit will proceed based on these two claims.

### 1. Counts I and II: National Origin and Sex Discrimination

Title VII of the Civil Rights Act makes it unlawful for an employer to discriminate against any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *accord Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

An "adverse employment action" is "'a significant change in employment status," which includes "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)); *see also Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003) (explaining same). To

find that an adverse employment action occurred, the D.C. Circuit, until recently, required courts to conclude that "a reasonable trier of fact could find objectively tangible harm" based on "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities." *See, e.g.*, *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  In *Chambers v. District of Columbia*, the D.C. Circuit revisited this rule to hold that an employee's forced transfer or denial of a transfer request because of that employee's protected status constitutes an adverse employment action, despite a lack of "objectively tangible harm" like economic impact.  35 F.4th 870, 874–75 (D.C. Cir. 2022).  Instead, "[o]nce it has been established that an employer has discriminated against an employee with respect to that employee's terms, conditions, or privileges of employment because of a protected characteristic, the analysis is complete."  *Id.*

The *Chambers* Court declined to reach the question of whether even *de minimis* harms could satisfy that standard, or if the principle *de minimis non curat lex*—the law is not concerned with trifles—remains a part of Title VII, as this principle is generally presumed incorporated in every statute absent an indication to the contrary.  *See id.* at 875 (citing *Wisc. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992)).  Defendant argues that, even post-*Chambers,* "trivial, de minimis harms" are not actionable to support Title VII discrimination claims, relegating to this "trivial" category plaintiff's allegations of "exclusion from meetings, emails, and discussions; being subjected to greater scrutiny than his peers; being given marginal ratings; criticisms of his work; the termination of one of his subordinates and the hiring of a replacement; and discussions about pronunciations of his and his supervisors' names."  Def.'s Mem. at 16–17.  Plaintiff counters that these harms "negatively affected the terms, conditions, or

privileges of" plaintiff's employment to the same extent that the denial of a transfer request did in *Chambers*, and thus are actionable under the modern standard.  Pl.'s Opp'n at 15–17.

*Chambers* acknowledges that "[a]lthough the phrase is not without limits—not everything that happens at a workplace affects an employee's 'terms, conditions, or privileges of employment'—the transfer of an employee to a new role, unit, or location (as opposed to the mere formality of a change in title [discussed in Judge Walker's partial concurrence]) undoubtedly is included."  *Chambers*, 35 F.4th at 874.  In light of this guidance, and bearing in mind the oft-repeated caution that Title VII is not a "general civility code" that makes actionable "the ordinary tribulations of the workplace," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted), not all of plaintiff's allegations can be said to constitute adverse employment actions.  Austin's correction of plaintiff's pronunciation of her name in several successive team meetings in June through August of 2021, her making inquiries about his performance as manager while he was away, her giving plaintiff poor performance ratings in his July and December 2021 reviews, and her reinstatement of a previously discontinued project under a different supervisor, all fall into the category of a supervisor's ordinary workplace exercise of authority that did not adversely affect the conditions of plaintiff's employment, though these actions undoubtedly caused tribulations, eroded plaintiff's morale, and likely undermined his supervisory position within LC.

Nonetheless, plaintiff does allege certain actions that undoubtedly affected the terms, conditions, or privileges of his job at GAO.  Most notably, the revocation of his flexible work schedule and eventual reassignment to a different department in a non-managerial position are inarguably major changes to the conditions of his employment.  Defendant does not seriously contest this.  *See* Def.'s Mem. at 17 n.2.  Plaintiff's allegation that Austin "announced" that he

would be "excluded from all future LC management meetings," Compl. ¶ 63, also qualifies. Plaintiff had been attending those meetings since 2016 and was the only director now excluded, such that this announcement plainly effected a notable alteration to the terms of his employment, with a public demotion of his standing in LC's leadership team.  Similarly, Austin's near-simultaneous transfer of an employee who had been reporting directly to plaintiff is alleged to have had the effect of "remov[ing] the Plaintiff's management responsibilities on [a] project that he had led for the past four years," *id.* ¶ 64, and as such can be said to have affected the conditions of his employment.

Having established that plaintiff sufficiently alleged several adverse employment actions, however, does not end the matter.  Plaintiff must also adequately allege a causal connection between those adverse actions and his national origin or sex.  Here, his sex discrimination claim falters.  Plaintiff relies primarily on conclusory assertions that Austin "subject[ed] him to greater scrutiny than his female peers," *id.* ¶ 98, and "unlawfully discriminated against Plaintiff based on his sex" when she took the adverse actions against him, *id.* ¶¶ 98–104.  Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" at the pleading stage and cannot sustain plaintiff's sex discrimination claim.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  The only specific factual bases plaintiff provides to establish that these decisions were made based on plaintiff's sex are that plaintiff was one of only two men on a team of mostly women, his supervisors were women, Austin complained on several occasions about a "man" who had made her life difficult, and that a female employee eventually took over some of plaintiff's former job duties.  *See* Compl. ¶¶ 12, 14–16, 19, 102, 105.  These allegations border on entirely innocuous and fall far short of establishing that plaintiff was plausibly discriminated against based on his gender.

Plaintiff's claim for discrimination based on his national origin finds substantially firmer footing. Those allegations include several specific instances of Austin drawing attention to, overtly criticizing, and most egregiously, "mimick[ing] and caricatur[ing]" plaintiff's Iranian background and accent, with these incidents occurring regularly throughout the time period narrated by the Complaint. *See* Compl. ¶¶ 9, 11, 42–45. Taken together, these allegations give rise to a plausible inference that Austin was motivated at least in part by her demonstrated animus towards plaintiff's national origin in taking the adverse employment actions against him. Indeed, defendant does not contest that plaintiff plausibly alleges a causal connection between his mistreatment and his national origin. *See* Def.'s Mem. at 22 (acknowledging that plaintiff's "national origin . . . claim[]" "should survive beyond the pleading stage").

In sum, some of plaintiff's allegations amount to adverse employment actions that plausibly support his national origin discrimination claim in Count I. Plaintiff does not likewise establish a plausible causal connection between the adverse employment actions and his sex, so his Title VII sex discrimination claim in Count II must be dismissed.

### 2. *Count III: Retaliation in Violation of Title VII*

"To establish a prima facie case of retaliation, a [Title VII] claimant must show that: (1) [he] engaged in a statutorily protected activity; (2) [he] suffered a materially adverse action by [his] employer; and (3) a causal connection existed between the two." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).

Defendant does not dispute that plaintiff alleges that he engaged in a statutorily protected activity—here, pursuing his administrative complaints against Austin for discrimination and hostile work environment with GAO's O&I—or that Austin's actions immediately following plaintiff's initiation of administrative proceedings had some causal connection to them. *See, e.g.*,

*Allen v. Johnson*, 795 F.3d 34, 46 (D.C. Cir. 2015) ("It is well established that evidence of a pattern of antagonism following closely on the heels of protected activity and related to the challenged employment action may establish the causation element of a Title VII plaintiff's" retaliation claim (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1357–59 (D.C. Cir. 2012))). Instead, as with the discrimination claims, defendant focuses on the adversity requirement, arguing for partial dismissal of plaintiff's retaliation claim on the basis that many of plaintiff's allegations are non-actionable, "trivial, de minimis harms" rather than "final, adverse personnel actions." Def.'s Mem. at 16–17.

In contrast to the corresponding requirement in Title VII discrimination claims, actionable adverse actions in a retaliation claim are not "limited to actions affecting the terms, conditions, or privileges of employment" and thus retaliation claims may encompass an employer's retaliatory actions that are not related to the employee's job at all, so long as the actions are "materially adverse" in an "objective" sense. *Chambers*, 35 4th at 876–77 (internal quotations omitted). "A materially adverse action is one that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). As such, defendant's arguments regarding the *de minimis* nature of some of plaintiff's allegations have more force in the retaliation context, where courts still look for "objective" materiality in much the same way that they used to require "objectively tangible harm" in discrimination claims. *See, e.g.*, *Chambers*, 35 F.4th at 876–77 (comparing the two contexts); *Hornsby v. Watt*, 217 F. Supp. 3d 58, 66 (D.D.C 2016) (concluding, under the previously applicable standard for discrimination claims, that "while the scope of actions covered by Title VII's substantive provision and its anti-retaliation provisions differ, the magnitude of harm that

plaintiff must suffer does not"). "Typically, a material adverse action in the workplace involves 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)). Other types of difficulties in the workplace—including clashes with supervisors or negative performance reviews—become "materially adverse" only when they result in tangible job consequences like a change in pay, position, or promotional opportunities. *Taylor*, 571 F.3d at 1321 (citing *Baloch*, 550 F.3d at 1199).

As to the retaliation claim, then, once again, review of plaintiff's allegations makes clear that the revocation of plaintiff's benefit of a flexible schedule and his reassignment to a non-managerial position are actionable, materially adverse actions. As "a decision causing significant change in benefits" and a "reassignment with significantly different responsibilities," respectively, these are prototypical "significant change[s] in employment status," *Bridgeforth*, 721 F.3d at 663, and as such provide solid underpinning for plaintiff's retaliation claim.

Plaintiff's remaining exhausted allegations, though, are another matter. As discussed *supra*, many of these are so *de minimis* that they could not even be said to affect the "terms, conditions, or privileges of employment," let alone result in objectively material consequences. Those allegations of ordinary workplace tribulations that were non-actionable in plaintiff's discrimination claims are likewise non-actionable in his retaliation claim. *See, e.g.*, *Baloch*, 550 F.3d at 1199 (concluding that repeated altercations with a supervisor did not "constitute material adversity for purposes of a retaliation claim"). Furthermore, while the allegations of plaintiff's exclusion from management meetings and the transfer of an employee from under his supervision plausibly altered the conditions of his employment for the purposes of his

discrimination claims, these changes cannot be said to be sufficiently significant to have

dissuaded a reasonable employee from pursuing his discrimination claims.  *See Taylor*, 571 F.3d

at 1320–21 (explaining that "petty slights" and "alteration of job responsibilities" could not

support retaliation claims).

In short, plaintiff's Complaint adequately states a claim for retaliation insofar as this

claim is based on the revocation of his flexible work schedule and his reassignment to a non-

managerial position, but the remaining exhausted allegations do not constitute materially adverse

actions.  Defendant's motion to partially dismiss the retaliation claim, to the extent this claim is

based on the latter allegations, is granted.

### 3.  *Count IV: Title VII Hostile Work Environment*

"To state a Title VII hostile work environment claim, a plaintiff must allege 'that his

employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently

severe or pervasive to alter the conditions of [his] employment and create an abusive working

environment.'"  *Horsey v. U.S. Dep't of State*, 170 F. Supp. 3d. 256, 264 (D.D.C. 2016) (quoting

*Baloch*, 550 F.3d at 1201).  The "very nature" of hostile work environment claims involves

"repeated conduct" and, consequently, the relevant "unlawful employment practice . . .  cannot

be said to occur on any particular day . . .  and, in direct contrast to discrete acts, a single act of

harassment may not be actionable on its own."  *Morgan*, 536 U.S. at 115 (internal quotation and

citations omitted).   Under well-settled law, "[p]rovided that an act contributing to the claim

occurs within the filing period, the entire time period of the hostile environment may be

considered by a court."  *Id.* at 117.  As a result, plaintiff's failure to exhaust administrative

remedies as to all the alleged instances of employer misconduct does not affect his hostile work

environment claim, and all these factual allegations are considered in support of plaintiff's

hostile work environment claim, including those regarding conduct that took place prior to May 30, 2021.

A hostile work environment is one "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations omitted). Determining whether a hostile work environment exists is a fact-intensive analysis, requiring consideration of "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Horsey*, 170 F. Supp. 3d at 264 (quoting *Baloch*, 550 F.3d at 1201). As the Supreme Court put it, "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace . . . .'" *Faragher*, 524 U.S. at 787 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); B. LINDEMANN & D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW 175 (1992)). As such, "a few isolated incidents of offensive conduct do not amount to actionable harassment," and "not all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Stewart v. Evans*, 275 F.3d 1126, 1133–34 (D.C. Cir. 2002) (internal quotation omitted).

In particular, "courts have generally rejected hostile work environment claims that are based on work-related actions by supervisors." *Grosdidier v. Chairman, Broadcasting Bd. of Governors*, 774 F. Supp. 2d 76, 110–11 (D.D.C. 2011); *see also Swann v. Off. of Architect of Capitol*, 73 F. Supp. 3d 20, 32 (D.D.C. 2014) (explaining that "[c]ourts in this district consistently have found that these sorts of employment-related actions"—such as a denial of overtime, termination of grace period for late arrival, and application of a civilian clothes

decorating policy—"are not sufficiently severe or offensive to support a hostile work environment claim"); *Bell v. Gonzales*, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) (holding that workplace decisions like "exclusion from the informal chain of command, close monitoring of [plaintiff's] work, missed opportunities for teaching, travel, and high-profile assignments" did not create a hostile work environment).

Here, plaintiff's hostile work environment claim centers on allegations that plaintiff's supervisor was rude and insensitive about his Iranian background and accent, evinced a dislike of male coworkers, was overly critical of his work performance, singled plaintiff out for closer scrutiny than she gave others, excluded him from meetings and emails, and stripped him of projects and management responsibilities. Compl. ¶¶ 132–39. While plaintiff's allegations paint a picture of repeated clashes with an allegedly hostile and rude supervisor over a period of years, which undoubtedly impacted plaintiff's happiness at work, they do not meet the high bar of "discriminatory intimidation, ridicule, and insult" that is so "severe or pervasive" that it gives rise to actionable abuse. *Harris*, 510 U.S. at 21. Courts have frequently dismissed hostile work environment claims centered on similar allegations of conflict with a manager, occasional denial of privileges, changes to work duties, and close scrutiny, as such occurrences are not sufficiently offensive, intimidating, or out of the ordinary in a typical workplace to change the conditions of the plaintiff's employment. *See, e.g.*, *Johnson v. Perez*, 66 F. Supp. 3d 30, 44–45 (D.D.C. 2014) (K.B. Jackson, J.) (collecting cases where harsh and rude conduct did not meet the standard for a discriminatory hostile work environment); *Bell v. Fudge*, No. 20-cv-2209 (CRC), 2022 WL 4534603, at *6 (D.D.C. Sept. 28, 2022) ("[W]orking for a bad boss, by itself at least, is not cognizable under Title VII."); *Dudley v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d

141, 171 (D.D.C. 2013) ("[H]aving a rude, harsh, or unfair boss is not enough for a hostile work environment claim.").

*Nurriddin v. Bolden*, 674 F. Supp. 2d 64 (D.D.C. 2009), provides a particularly apt comparator for plaintiff's allegations. There, the plaintiff alleged that his managers "passed him over for performance awards, lowered his performance evaluations, unfairly reprimanded and criticized him, made disparaging remarks . . . , closely scrutinized his work, refused him a window cubicle, removed some of his duties, and denied his requests to travel," as well as "that, after he developed health problems, management denied many of his leave requests and engaged in a series of discussions to end his eligibility for workers' compensation and to terminate his employment . . , before finally firing him." *Id.* at 93–94. Granting a motion to dismiss the hostile work environment claim, *Nurriddin* concluded that the "plaintiff has fallen far short of alleging conduct that . . . amounts to 'intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment.'" *Id.* at 95 (quoting *Harris*, 510 U.S. at 21). Other cases have reached similar conclusions. *See also, e.g.*, *Outlaw v. Johnson*, 49 F. Supp. 3d 88, 92 (D.D.C. 2014) (dismissing for failure to state a claim a hostile work environment count "referring only to promotion denials, a subjective performance review, and being hired at a lower grade than Caucasian employees"); *Laughlin v. Holder*, 923 F. Supp. 2d 204, 219–20, 221 (D.D.C. 2013) (deeming insufficient allegations of denied promotions and bonuses, interference with efforts to carry out certain job duties, pressure to retire); *cf. Baloch*, 550 F.3d at 1201 (concluding from the record at summary judgment that the plaintiff "clashe[d] with his supervisor in the workplace" but finding no hostile work environment where the plaintiff's supervisor criticized the plaintiff's work, restricted his leave, verbally fought with the plaintiff, and threatened his arrest). As in *Nurriddin* and these

other cases, the allegations here—the interference with some of plaintiff's job duties over two

years; rude comments and criticism regarding plaintiff's accent and gender; exclusion of plaintiff

from meetings, emails, and management decisions; harsh feedback in his performance review;

and revocation of his flexible schedule and managerial responsibilities—are not so severe or

pervasive as to be objectively hostile or abusive.  *See Harris*, 510 U.S. at 21 ("Conduct that is

not severe or pervasive enough to create an objectively hostile or abusive work environment—an

environment that a reasonable person would find hostile or abusive—is beyond Title VII's

purview.").

    As such, although plaintiff's hostile work environment claim is timely, defendant's

motion to dismiss this claim under Rule 12(b)(6) is granted.

## VI.    CONCLUSION

    For the foregoing reasons, defendant's partial motion to dismiss is GRANTED IN PART

and DENIED IN PART.  Plaintiff's claims for sex discrimination and hostile work environment,

in Counts II and IV, respectively, are dismissed in their entirety, while his claims for

discrimination based on national origin and retaliation, in Counts I and III, respectively, survive

insofar as they are based on the actionable, administratively exhausted allegations. *See supra* n.2.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  December 23, 2022

_____
BERYL A. HOWELL
Chief Judge